UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

LISA WOODS,

                     Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                     Defendant.

Case No. 11-CV-415-JPS

ORDER

---

On May 15, 2006, plaintiff Lisa Woods ("Woods") filed applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") with the Social Security Administration, alleging a disability beginning on July 12, 2005. Woods's disability claims were denied both upon the initial application and upon reconsideration. After these denials, Woods filed for a hearing before an Administrative Law Judge ("ALJ"). A hearing occurred on May 13, 2009, where Woods testified. On September 2, 2009, the ALJ concluded that Woods was ineligible for SSI and DIB. Subsequently, the Appeals Council of the Social Security Administration denied review, rendering the ALJ's decision final. As a consequence, Woods filed this action for judicial review of the Commissioner of Social Security's decision denying the plaintiff's applications for SSI and DIB.

1.     Background

Woods was a younger individual at the time of the ALJ's decision, had a high school education, and was a few credits short of earning an Associate's degree. (Tr. 35, 150, 185). Woods had past work experience as a file clerk,

receptionist, hotel clerk, and reception information clerk. (Tr. 36-39, 79, 178, 208-11).

In her Disability Report, Woods stated that she was disabled due to fibromyalgia, neck and back pain, high blood pressure, diabetes, a heart murmur, weakness, depression, and panic attacks. (Tr. 177). She indicated that she was in chronic pain. (Tr. 178). Woods reported her activities included caring for her baby, preparing meals three to four times per week, doing laundry, shopping for groceries, reading, going to church, and socializing with some women from church. (Tr. 186-90).

At the hearing, plaintiff testified that she lived with her five children, ranging in age from four to twenty years old. (Tr. 34). She testified that she could not work due to pain, fibromyalgia, back problems, and anxiety. (Tr. 40). She experienced pain in her knees, back, and "all over" from fibromyalgia. (Tr. 40). Plaintiff also testified that her pain affected her daily activities such that it was difficult for her to take care of her daily needs. (Tr. 43). She stated that her older children helped care for her younger children. (Tr. 43). She noted that she used a cane and could sit about fifteen to twenty minutes, stand using the cane, walk about a quarter of a mile and lift five pounds. (Tr. 44-46). She testified that she did not go out in public because of her anxiety, and that during the last week alone she had six anxiety attacks. (Tr. 50). She also stated that she had difficulty focusing, problems with anger, and difficulty getting along with people in general. (Tr. 52-53).

Prior to her alleged onset of disability, the medical notes indicate a history of diabetes, hypertension, headaches, neck pain, depression, and an anxiety disorder. (Tr. 331-47, 463-68). In June 2003, Dr. Trotter – a rheumatologist – diagnosed fibromyalgia, recommended exercise and

weight loss for claimant, and suggested aggressive physical therapy and spinal injections. (Tr. 468). On May 10, 2006, claimant saw Dr. Trotter and complained she could not walk without pain. (Tr. 404). Woods then saw Dr. Trotter on four separate occasions during 2007 and 2008. During those visits, Dr. Trotter reported that plaintiff had chronic fibromyalgia and chronic pain. It was also noted that Woods had a cervical disk disease at C5-6 and a large left paracentral disc, TMJ, and osteoarthritis of the knees. (Tr. 520-26). Examination findings included "classical fibromyalgia" and generalized stiffness. On July 28, 2008, Dr. Trotter noted that claimant was getting a high-dose of narcotics from a pain doctor, that she was probably addicted, and that the medications were not working. (Tr. 521). On October 2, 2008, Dr. Trotter recommended that plaintiff stop taking medications that did not work. (Tr. 520). On January 29, 2009, Dr. Trotter completed a form indicating claimant's limitations. She opined that Woods could sit no more than two hours, stand thirty minutes, walk forty-five minutes, and lift less than ten pounds rarely in an eight-hour workday. (Tr. 517). Dr. Trotter further stated that claimant had environmental limitations, would need an unscheduled break during the day, and would likely miss three days of work per month because of her condition. (Tr. 518).

Woods was also seen at Aurora Health Care from September 13, 2006, to January 28, 2009. Medical notes indicate that claimant's anxiety and depression were stable. (Tr. 560-61). Moreover, an MRI of the lumbar spine indicated mild degenerative disc disease at L4-L5 and mild facet arthropathy at L5-SI. (Tr. 461). On April 11, 2007, Woods had an epidural steroid injection in her lumbar spine. (Tr. 544). A bone scan from July 31, 2008, showed mildly increased activity in the shoulders and knees consistent with degenerative

changes. (Tr. 527). In early 2009, Woods fell and injured her right wrist. (Tr. 637). On April 2, 2009, a whole bone scan indicated increased activity over the mid-sacrum and right wrist consistent with known sacral and wrist fracture and mid-thoracic spine. (Tr. 637-38). Subsequently, an MRI of the thoracic spine indicated an acute fracture of T7. (Tr. 647).

Beginning in 2007, claimant went to Advanced Pain Management where she was seen by Dr. Stauss. In February of 2007, Woods complained of upper extremity pain, low back pain, and left knee pain. (Tr. 628). Dr. Stauss diagnosed lumbago, degeneration of the lumbar/lumbosacral disk, neuritis, and degenerative facet arthropathy at L5-S1. (Tr. 630). Dr. Stauss and his physician's assistant prescribed Lyrica and Percocet. (Tr. 623, 630). On October 4, 2007, claimant reported that she had improved pain relief with the Percocet. (Tr. 618). On November 30, 2007, plaintiff indicated that her pain continued to improve with the medication. (Tr. 615). Over the course of her treatment at Advanced Pain Management, she admitted improvement in her pain with pain medication and rest. (Tr. 583, 586, 600, 603, 606, 609, 612). On April 18, 2008, Woods noted that overall she had been stable. (Tr. 606). On December 30, 2008, Woods reported that she had done "fairly well" since the last office visit. (Tr. 586).

On February 20, 2009, Keith Hatch, a board-certified orthopedic clinical specialist, examined Woods and completed a Functional Capacity Evaluation. (Tr. 581). Mr. Hatch opined that Woods was precluded from even sedentary work. (Tr. 582). Further, he opined that Woods needed to take frequent, unscheduled breaks, was unable to stand more than one hour in an eight-hour workday, and could sit twenty-five to thirty minutes at a time for a maximum of four hours in an eight-hour workday. (Tr. 582).

On July 14, 2006, state agency physician Dr. Chan reviewed the record evidence and opined that plaintiff could perform medium exertion work. (Tr. 412). On December 13, 2006, state agency physician Dr. Muceno completed a Physical Residual Functional Capacity Assessment after reviewing the evidence and opined that Woods could perform light exertion work. (Tr. 495-501).

Woods also received treatment for her mental conditions. On November 9, 2006, she underwent a psychological consultative examination with Dr. Nichols. (Tr. 470). Dr. Nichols's impression was major depression and panic disorder with agoraphobia. (Tr. 473). He assessed a Global Assessment of Functioning ("GAF") score of 45.[1] (Tr. 473). On December 12, 2006, Dr. Bauer, a state agency psychologist, opined that Woods's affective disorder and anxiety-related disorder resulted in mild limitations on activities of daily living and moderate limitations in social functioning and in concentration, persistence or pace. (Tr. 486).

Woods's treating psychiatrist, Dr. Khan, saw her from May 30, 2007, until January 5, 2009. At her initial assessment, Woods complained of anxiety attacks. Dr. Khan assessed Woods with major depressive disorder and panic

---

[1] The Global Assessment of Functioning scale reports a clinician's assessment of an individual's overall level of functioning. *Craft v. Astrue*, 539 F.3d 668, 676 n.7 (7th Cir. 2008). GAF scores run from 0 to 100 and indicate an increasing ability to function as the numbers get larger. *Kluesner v. Astrue*, 607 F.3d 533, 535 (8th Cir. 2010). A GAF score of 41 to 50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000) ("DSM-IV").

disorder as well as a GAF score of 65.[2] (Tr. 534). Dr. Khan completed a medical assessment form on July 29, 2008, in which he opined that claimant had no restrictions of activities of daily living, but moderate difficulties maintaining social functioning and moderate to marked difficulties with concentration, persistence, and pace. (Tr. 515). He also opined that Woods would likely be absent from work more than four days per month due to her impairments. (Tr. 516).

One month prior to her hearing, Woods was referred by her Wisconsin Works manager to a psychologist to determine her current level of cognitive intellectual functioning, basic academic skills, emotional equilibrium, and social adaptation. (Tr. 639). On April 20, 2009, Dr. Hewitt administered several tests to Woods. Claimant's IQ scores were well below that expected for a person with her academic history and, as such, Dr. Hewitt indicated that claimant's scores were of questionable validity. (Tr. 643-45). Dr. Hewitt also noted that Woods may have exaggerated her difficulties on a specific test and that her scores may be due to conscious deception or an unrealistic view of herself. (Tr. 644). Dr. Hewitt indicated that the questionable validity of the test scores may be a "cry for help" and that such an exaggerated profile is not uncommon in some persons who fear losing "some kind of benefit." (Tr. 644). Dr. Hewitt opined that claimant would not be able to seek any type of employment. (Tr. 646).

Dr. Armentrout, a licensed psychologist, testified as a medical expert at claimant's hearing. He reviewed the evidence and was present for plaintiff's testimony. Dr. Armentrout opined that plaintiff had a good ability

---

[2] A GAF score of 61 to 70 is indicative of some mild symptoms or some difficulty in social, occupation, or school functioning. DSM-IV at 32.

to tolerate the proximity of other workers, to relate to supervisors, and to manage brief passing contact with the public. (Tr. 69-70). He noted that she had a good ability to work in a relatively routine, predictable, familiar setting in which she carried out repetitive, uncomplicated tasks. (Tr. 70). He also opined that Woods had a good ability to exert the level of judgment and maintain the concentration required in a relatively familiar, routine, repetitive type of activity, and had sufficient concentration to perform uncomplicated tasks and carry out simple instructions. (Tr. 71-72).

2.  Standard of Review

When reviewing a Social Security benefits determination, the court must uphold the ALJ's decision if it is supported by substantial evidence and is free of legal error. 42 U.S.C. § 405(g); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence is such relevant evidence "as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). In determining whether substantial evidence exists, the court reviews the record as a whole; however, the court will not substitute its judgment for that of the agency "by reconsidering facts, re-weighing the evidence, resolving conflicts in evidence or deciding questions of credibility." *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001) (citing *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999)). Thus, the standard of review is deferential, requiring only that the ALJ minimally articulate his analysis. Even so, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ is required to build an "accurate and logical bridge" between the evidence and the result.

*Id.* at 941. This is not to say that the ALJ must discuss every piece of evidence or testimony. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). All the ALJ must provide is a "small glimpse" into his reasoning. *Id.* On the other hand, conclusions of law are not entitled to such deference. Thus, if the ALJ commits an error of law, reversal is required "without regard to the volume of evidence in support of the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

To qualify for disability benefits under the Social Security Act, a claimant must be found "disabled." 42 U.S.C. § 423(a)(1)(E). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting 42 U.S.C. § 423(d)(1)(A)); 20 C.F.R. § 416.905(a). The Social Security regulations create a five-step, sequential test for determining whether a claimant is disabled. *Briscoe v. Barnhart*, 425 F.3d at 351. The first step considers whether the claimant is presently employed. 20 C.F.R. § 416.920(a)(4). The second step evaluates whether an alleged physical or mental impairment (or a combination of impairments) is severe, medically determinable, and meets a durational requirement. *Id.* The third step compares the impairment to a list of impairments that are considered conclusively disabling. *Id.* If the impairment equals one of the listed impairments, the claimant is considered disabled; if the impairment does not equal a listed impairment, the evaluation continues. *Id.* The fourth step assesses a claimant's Residual Functional Capacity ("RFC") – that is, the work the claimant can still do despite her physical and mental limitations –

and her ability to engage in past relevant work. *Id.* If the claimant is able to engage in past relevant work, the claimant is not disabled. *Id.* If the claimant has no past relevant work or is unable to engage in this work, the disability determination moves to step five. *Id.* The fifth step also assesses the claimant's RFC, as well as her age, education, and work experience. *Id.* If the claimant can make an adjustment to other work, based on all these factors, she is not disabled. *Id.*

3. The ALJ's Decision

The court begins by reviewing the decision of the ALJ. In this case, at step one, the ALJ determined that Woods had not engaged in substantial gainful activity since July 12, 2005. (Tr. 28). At step two, the ALJ found that Woods had severe impairments due to: degenerative disc disease aggravated by obesity, possible fibromyalgia, hypertension, diabetes, asthma, a recent right wrist fracture and T7 fracture from a fall, and affective and anxiety disorders. (Tr. 28-29). At step three, the ALJ determined that the claimant's combination of impairments did not equal any of the listed impairments. (Tr. 29). The ALJ next determined that Woods had an RFC to perform light work; however, he limited her to simple, unskilled work with limited contact with coworkers or supervisors and no contact with the general public. (Tr. 29). At step four, the ALJ concluded that Woods was unable to perform any past relevant work. (Tr. 29). At step five, after considering the claimant's age, education, work experience, and RFC, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that claimant can perform." (Tr. 29). Therefore, the ALJ found Woods was not disabled.

4. Discussion

Woods disputes the ALJ's determination and alleges that the ALJ committed two main errors in reaching his conclusions. First, Woods argues that certain of her medical sources' opinions should have been given greater weight and that the ALJ gave too great of weight to two of the state agency physicians' opinions. Additionally, Woods challenges the ALJ's negative credibility determination. The court will address each issue in turn.

4.1 Evaluation of Medical Source Opinions

The ALJ found that, despite Woods's severe impairments due to degenerative disc disease aggravated by obesity, possible fibromyalgia, hypertension, diabetes, asthma, a recent right wrist fracture and T7 fracture, and affective and anxiety disorders, Woods retained the RFC to perform light work, provided it was limited to simple, unskilled work, with limited contact with coworkers or supervisors and no contact with the general public. (Tr. 29).

In reaching this RFC determination, the ALJ gave little weight to the opinions of Woods's two principal treating physicians – Dr. Trotter and Dr. Khan. He reasoned that their opinions were inconsistent with the "bulk of the medical records" as well as with their own progress notes. (Tr. 25). Woods contends that both Dr. Trotter's opinion and Dr. Khan's opinion were entitled to greater weight. However, the court finds that the weight afforded to the opinions of these treating physicians was not in error.

An ALJ makes an RFC determination by weighing all the relevant evidence of record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. In doing so, he must determine what weight to give the opinions of the claimant's treating physicians. 20 C.F.R. § 404.1527. A treating physician's opinion is entitled to

controlling weight if it is supported by the medical findings and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). However, so long as the ALJ "minimally articulates his reasons," he may discount a treating physician's opinion if it is inconsistent with that of a consulting physician or other substantial medical evidence. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). An ALJ may also discount a treating physician's medical opinion if it is internally inconsistent. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Here, as previously stated, the ALJ explained why he afforded both Dr. Trotter's and Dr. Khan's opinions less weight – that they were internally inconsistent and inconsistent with other evidence in the record. The ALJ supported his explanation regarding Dr. Trotter's opinion by noting that while Dr. Trotter was satisfied that Woods displayed classic symptoms of fibromyalgia, Dr. Trotter's medical records did not show that she conducted the standard examination of whether Woods had tenderness at any of the eighteen fixed locations associated with fibromyalgia. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("[T]he only symptom that discriminates between [fibromyalgia] and other diseases of a rheumatic character [are] multiple tender spots, more precisely 18 fixed locations on the body…that when pressed firmly cause the patient to flinch."). The ALJ reasonably found that this lack of a traditional diagnosis undermined Dr. Trotter's opinion regarding the claimant's level of functional disability caused by her reported pain and symptoms. (Tr. 21). Moreover, while the ALJ recognized several laboratory tests indicating that claimant suffered from some degenerative arthritis, the ALJ found it suspicious that Dr. Trotter repeatedly

recommended that the claimant lose weight and exercise, while at the same time opined that claimant was significantly limited in her abilities to sit, stand, and lift during a normal eight-hour workday. Though the ALJ's reasoning could be more clear in this respect, it would seem that the ALJ found Dr. Trotter's recommendation that claimant exercise inconsistent with her opinion that claimant was significantly limited in her abilities to sit, stand, and lift during an eight-hour workday. Such a conclusion is not entirely unreasonable – indeed, it is the ALJ's duty to draw such inferences from the facts presented to him.

Not only was Dr. Trotter's opinion regarding Woods's limitations internally inconsistent, but it also clashed with the opinion of consulting physician Dr. Muceno who opined that Woods could perform light exertion work. (Tr. 495-501). The ALJ gave greater weight to Dr. Muceno's opinion because he found that it was supported by the medical evidence of record. (Tr. 27). In this regard, the ALJ found that Dr. Muceno's opinion was in line with the treatment notes of Dr. Stauss – the physician providing Woods with pain medication – as Dr. Stauss repeatedly noted that Woods was stable and that her medications allowed her to function and provided her with effective pain relief. (Tr. 26). In fact, the ALJ found that the claimant's inconsistent allegations of pain and pain relief from medication – the inconsistency being that she told Dr. Stauss pain medication relieved her pain, while at the same time, she told Dr. Trotter that the medication did not help her pain – undermined Dr. Trotter's assessment of claimant's limitations, as the opinion was based almost entirely on claimant's subjective allegations. Because an ALJ may properly reject a doctor's opinion when considering an application for SSI benefits if it appears to be based on a claimant's exaggerated

subjective allegations, *Dixon v. Massanari*, 270 F.3d at 1178, the court does not find the ALJ erred in this respect.

Moreover, with regard to Dr. Khan's opinion, the ALJ found that it was inconsistent with the doctor's own notes, which at times reported Woods's depression and anxiety to be stable or at least not of any great significance. The ALJ also found Dr. Khan's initial assessment of claimant's GAF score of 65 to suggest that Woods was actually quite functional compared to Dr. Khan's later assessment. Moreover, Dr. Khan's notes contained little in the way of objective findings, referring mainly to modifications in plaintiff's medication regimen. Because Dr. Khan's opinion was not supported by a clear explanation or medical evidence – via his treatment notes – the ALJ determined it was entitled to less weight than it might be otherwise. Under the regulations, the ALJ was warranted in concluding as much. *See* 20 C.F.R. § 404.1527(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give to that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Additionally, the ALJ found that other evidence called into question Dr. Khan's opinion. Specifically, in direct contrast to Dr. Khan, Dr. Armentrout – who considered the entire record, plaintiff's testimony and Dr. Khan's notes – opined that Woods would be capable of performing simple, routine, non-stressful type of jobs. (Tr. 68-70). Dr. Armentrout recognized that Woods suffered from depression and an anxiety disorder, but he believed that she exaggerated her functional limitations, a conclusion that the ALJ also made, based on the entire record as well as plaintiff's testimony. (Tr.

27). Furthermore, the ALJ considered Dr. Hewitt's report, which indicated skepticism regarding the validity of plaintiff's test scores and called into question Woods's credibility regarding her subjective complaints – and in turn, Dr. Kahn's opinion regarding Woods's mental limitations, which was based entirely on those subjective complaints. The ALJ also discounted Dr. Khan's opinion because, although Dr. Khan noted three episodes of extended decompensation, there was no evidence of this in the record – specifically, Woods had not had any psychiatric hospitalizations. (Tr. 27). Woods's infrequent treatment with Dr. Khan was another reason why the ALJ discounted the doctor's opinion regarding claimant's mental limitations. (Tr. 27). Thus, the ALJ gave comprehensive explanations – all of which are supported by the record – for why he gave less weight to Dr. Trotter's and Dr. Khan's opinions and greater weight to the opinions of Dr. Muceno and Dr. Armentrout.

In sum, the opinion of a treating source, such as Dr. Trotter or Dr. Khan, may be rejected based on non-examining medical opinions and other relevant medical evidence from the record. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir.2006). Because the ALJ relied upon objective medical evidence and clearly and comprehensively explained his rationale, the ALJ did not improperly deny controlling weight to Trotter's or Dr. Khan's opinions. *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007). Furthermore, the ALJ was justified in giving substantial weight to the opinions of Dr. Muceno and Dr. Armentrout, and other non-examining sources, which he amply supported with evidence in the record. See 20 C.F.R. § 404.1527(f)(2)(iii).

Woods also appears to argue that the ALJ erred by not giving more weight to the opinions of Dr. Nichols and Dr. Hewitt. However, the ALJ

considered both of these opinions and reasonably concluded that they should be afforded little weight compared to the opinions of Dr. Muceno and Dr. Armentrout because of their internal inconsistencies and the fact that they were at odds with other evidence in the record. For instance, the ALJ noted that Dr. Nichols's GAF score of 45 conflicted with the doctor's mental status examination findings – namely, that Woods was alert and oriented; her speech was coherent and goal-directed; Woods was able to relate appropriately; her affect was also appropriate, though her mood was somewhat depressed; her insight and judgment were within normal limits; and she was able to recall two of three unrelated items after a brief delay. (Tr. 472-73). Moreover, the ALJ considered Dr. Hewitt's opinion that Woods would be unable to seek any type of employment. However, the ALJ further considered the underlying findings in Dr. Hewitt's report – including the test results of questionable validity and Dr. Hewitt's statements pertaining to these variant results – and concluded that these findings actually suggested that plaintiff was likely exaggerating her symptoms and limitations in an attempt to gain benefits. This was a reasonable conclusion and, accordingly, the court does not find the ALJ erred in affording less weight to Dr. Nichols's and Dr. Hewitt's opinions regarding claimant's ability to engage in gainful employment.

### 4.2  Credibility Determination

Woods also takes issue with the ALJ's credibility determination. A reviewing court may reverse an ALJ's credibility determination only if it is so lacking in explanation or support that it is "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). In evaluating the credibility of statements supporting a Social Security application, an ALJ must comply

with the requirements of Social Security Ruling 96-7p. *Steele,* 290 F.3d at 942. SSR 96-7p requires ALJs to articulate the reasons behind credibility evaluations:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." ... The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 WL 374186, at *4 (S.S.A. July 2, 1996).

In this case, the ALJ's credibility determination was neither lacking in support nor in explanation. As such, the court declines to disturb the ALJ's conclusions in this respect. As previously discussed, the ALJ found that plaintiff's credibility was undermined based on her performance on testing conducted by Dr. Hewitt as well as Woods's inconsistent allegations concerning medication and pain relief made to Dr. Trotter and Dr. Stauss. Moreover, although Woods complained of disabling back pain, the ALJ considered objective testing – including an October 2006 MRI which failed to show anything more than mild degenerative changes – and concluded this evidence did not support her allegations. The ALJ also considered Woods's daily activities and found they belied her allegations of complete disability. And, indeed, in reports given to the agency by claimant she indicated a wide range of daily activities, including child care, church activities, laundry, and meal preparation; however, at the hearing she testified that her daily activities were minimal due to her pain. It was reasonable for the ALJ to

conclude that her inconsistent accounts of daily activities undermined her credibility. Accordingly, because there was support for the ALJ's credibility finding and he adequately articulated his reasons for the finding, the decision is entitled to deference. As such, the court will affirm the ALJ's decision that Woods was not disabled.

Accordingly,

IT IS ORDERED that the decision of the Commissioner denying the plaintiff's application for disability insurance benefits and supplemental security income be and the same is hereby AFFIRMED; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED with prejudice.

The clerk is ordered to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of April, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Page 17 of 17

Case 2:11-cv-00415-JPS   Filed 04/30/12   Page 17 of 17   Document 18